MARY M. POWER, appellant,

v.

HENRY POWER, respondent.

[Argued December 4th, 1903.    Decided June 20th, 1904.
Filed June 20th, 1904.]

1. Although a husband, after separating himself from his wife and children without lawful excuse, still provides for their support, his conduct may constitute the matrimonial offence of desertion.

2. If, after a husband has deserted his wife, articles of separation reciting that they agree to live apart are signed by them, the husband may, notwithstanding, be adjudged guilty of continued, willful and obstinate desertion, in case it be shown that he knew his wife's attitude to be one of dissent from the separation, and his own attitude was one of determination to continue it, whether the articles were signed or not.

3. Under the circumstances of this case, a divorce being granted because of desertion by the husband, the custody of two children, one ten years old and the other five, was awarded to the wife.

On appeal from a decree advised by Vice-Chancellor Pitney, whose opinion is reported in *20 Dick. Ch. Rep. 93.*

*Mr. Richard V. Lindabury* and *Mr. William R. Barricklo,* for the appellant.

*Messrs. Crouse & Perkins,* for the respondent.

The opinion of the court was delivered by

DIXON, J.

The parties' to this suit were married June 24th, 1891, in Montclair, and resided there as husband and wife until September, 1899, during which time they had three children, of whom two are still living. For some time prior to September, 1899, their cohabitation had not been harmonious, and early in

that month the husband told his wife that her presence was extremely distasteful to him, that he was very sorry he had ever met her, and that he did not wish to live with her.   To this the wife replied that she was perfectly willing to do everything in her power to make their home life as pleasant as possible, that it made her extremely unhappy to see matters in such a condition, and she asked him if they could not be adjusted.   He answered that he had not the slightest intention of trying in any manner whatever, that he did not desire to and did not intend to.   A day or so afterwards the wife requested her brother-in-law, Mr. Westervelt, to see her husband about their difficulties. Mr. Westervelt did so, and on the witness-stand thus related his interviews with the husband:

"I told Dr. Power [the husband] that his wife had told me of her last conversation with him; that she wanted me to see him; that his father also wanted me to see him, and do what I could to make him willing to continue to live with her; I asked him if he would not be, under any circumstances, willing to do so; told him she had asked me to ask him that; he said he would not; he would not live with her under any circumstances; he wanted to be rid of her; I asked him what his reasons were —whether he had anything against her; he said that had nothing to do with the case—the fact was that he would not live with her; I tried to make him change his mind; talked to him about the disgrace it would bring upon his children; suggested to him that it would be more expensive than he could stand; I brought every means I could think of to bear upon him to make him state that he would be willing to try to continue to live with his wife; he refused; I asked him if there was not something she could do—any change she could make in the course of her living—that would make him more contented with his home life; stated that she was willing to do anything that he would ask her; he said there wasn't anything; a few days afterward, on the morning of September 14th, I went into his office shortly after breakfast; I said that his wife had asked me to make another appeal to him; that she was exceedingly desirous on the children's account, if on no other, to keep the home together—to patch things up so that they could continue to live together; he cut me very short and said there was nothing further of that kind to discuss; he wouldn't discuss it, and furthermore, he thought he had made it clear to me the last time I had seen him that what he wanted was a divorce; he expressed a wish that she should get a divorce from him; I said she was unwilling to— wouldn't do it; he asked me questions about the law in the matter [Mr. Westervelt being a lawyer] and I explained it to him; 'Well,' he said, 'I want that divorce and I don't want anything else; all my efforts will be directed to that end, and I want you to put it to Mary [Mrs. Power] in that light.'"

The truth of this narration is not denied. On the same day the husband left home and went to live with his father in the same town, and since that time the husband and wife have lived apart.

Immediately after the separation the husband employed an attorney, Mr. Jones, to act for him in the matter. Thereupon Mr. Jones saw Mr. Westervelt and assured him that Dr. Power would not return to the house while his wife was in it; that it was desirable to arrange some *modus vivendi;* that Dr. Power would require his wife to leave Montclair and sign away all her dower as a condition of receiving any support from him; that Dr. Power wanted to keep his house and his office, which was in it (he being a physician), and Mrs. Power must leave, as he would not live with her; that if she did not leave Montclair and sign an agreement, which should be prepared, she would not get any support from him; but if she did do so, Dr. Power's father would be willing to look after the matter of income.

This being the attitude of the parties, an agreement was prepared, and on November 15th, 1899, Mrs. Power, on the advice of Mr. Westervelt and having, she says, no other alternative, joined with her husband and a trustee in signing it. This writing declares that Dr. and Mrs. Power agree that they will live, and continue to live, apart; that Mrs. Power shall not remain in Montclair, but outside of that town shall have the right to choose her own separate residence; that she shall execute proper instruments for relinquishing her right of dower; that she shall have the custody of the children until they are seven years of age, after which their custody shall be subject to further arrangement, and that Dr. Power will pay to the trustee $95 a month for the support of Mrs. Power and the children during her natural life, subject to deduction in certain specified events.

Upon the execution of this instrument Mrs. Power, with her children, moved to the city of New York, where she has since resided, receiving from her husband, or his father, $95 per month and, by her own exertions as a teacher, earning the rest of her necessary expenses.

In November, 1902, she filed a petition in the court of

chancery for divorce, because of her husband's desertion; but, after hearing, the petition was dismissed, on the ground, *first,* that there had been no desertion; *second,* that if there had been, it ceased to be willful and obstinate upon the execution of the agreement. From this dismissal the petitioner appeals.

That on September 14th, 1899, Dr. Power deserted his wife seems to us indubitable. Having declared to her that he would not live with her, having heard her earnest expressions of desire that their cohabitation should be continued, he abandoned the matrimonial home and asserted his determination not to return while she was there. Certainly nothing more is wanting to make desertion complete. That he continued to send provisions to the house so that his wife and children might have food, may indicate that he had not given up all concern for their existence, but is not at all inconsistent with the matrimonial offence called desertion. As was said by Lord Penzanse, in *Yeatman* v. *Yeatman, L. R. 1 P. & D. 489:* "A wife is entitled to her husband's society and the protection of his name and home in cohabitation. The permanent denial of these rights may be aggravated by leaving her destitute or mitigated by a liberal provision for her support; but if the cohabitation is put an end to against the consent of the wife and without the intention of renewing it, the matrimonial offence of desertion is in my judgment complete." To the same effect was the decision in *Magrath* v. *Magrath, 103 Mass. 577,* which, in *Anonymous, 7 Dick. Ch. Rep. 349,* was cited with approval by Chancellor McGill.

The effect upon this desertion produced by the agreement of November 15th, 1899, requires more consideration. It is certain that the agreement did not give to either spouse, as against the other, the right to continue the separation. Notwithstanding it, each was entitled to demand of the other a resumption of marital relations. *Miller* v. *Miller, Sax. 391; Aspinwall* v. *Aspinwall, 4 Dick. Ch. Rep. 302.* Consequently the only question is whether it either indicates or gave rise to a change in the mental attitude of either party, showing mere consent to the separation instead of protest on the part of the wife, and instead of obstinate persistence on the part of the husband.

In solving this question the terms of the instrument are, of course, important, and they militate strongly against the petition of the appellant. But from the very nature of the inquiry they cannot be conclusive; they are only a part of the circumstances from which the truth must be inferred. No matter how explicit the declaration of the wife's agreement to live apart from her husband and to release him from his marital obligations, it is credible that she was but yielding to the necessities of the case, still recognizing, as the law recognized, the continuance of marital duty, both for herself and for her husband. And it is equally credible that the husband was aware of this condition and remained separated from his wife, not because he believed she assented to such separation, but because his resolution never to resume cohabitation was unaltered. If such a state of facts appears, they constitute willful, continued and obstinate desertion, no matter what is said in articles of separation. *1 Bish. Mar. & Div.* (6th ed.) § 805 b. Such was the decision in *Nott* v. *Nott, L. R. 1 P. & D. 251,* and in *Crabb* v. *Crabb, L. R. 1 P. & D. 601,* the judge ordinary remarked upon the distinction between a separation induced by a written agreement and a separation of which the real cause was the determination of a husband to abandon his wife, and the writing only put a false face upon the transaction. In *Moores* v. *Moores, 1 C. E. Gr. 275,* Chancellor Green gave effect to such a deed of separation as a ground for defeating an application by the husband for divorce, because of his wife's desertion, notwithstanding her continued purpose not to live with the complainant; but he based his conclusion also upon the fact that the husband had never intimated a desire or even a willingness that the state of separation should cease. Evidently he thought that such an intimation, made in good faith, would strip the deed of its force. His quotation from the opinion in *Butler* v. *Butler, 1 Pars. Sel. Cas. 335,* clearly shows that, when such a deed has been signed, the question still remains whether the separation resulted from or was continued because of the agreement expressed in it, or was the willful and perverse conduct of a deserter.

If, with this view of the question at issue, we consider the evidence, the statutory fault of the husband is proved.

Power *v.* Power.

When in September, 1899, Dr. Power left his wife and their two children, one under six, the other under one year of age, Mrs. Power had no means of livelihood except as she could earn it or it should be given to her. Her husband, although a physician in middle life, was earning so little that alimony secured by judicial decree would furnish very scant maintenance. His purpose not to have her living in his home was declared to be, and after utmost efforts to change it, seemed to be irrevocable, and was already in course of execution. Her brother-in-law, her only counselor, advised that she submit to what was demanded as the condition of any voluntary contribution for support of herself and her little ones, and her father-in-law, a man of wealth, promised such contribution on her compliance with her husband's demands. In yielding under these circumstances there is no sign of any withdrawal from that disposition of which she and her counsel had given her husband repeated assurance, a disposition protesting against separation and willing to do anything to win the husband back to their home. She was but saving what was salvable from the inevitable wreck.

The continuance of the husband's determination is also manifest. His demand that she should leave not only the house but even the town where they had lived, so that his practice might as little as possible be disturbed; the insertion of that provision in the deed of separation; his desire, expressed before the deed was signed, that his wife should know that he was absolutely intent on divorce; his assertion, when examined in this cause, that he had "had no personal dealings with Mrs. Power whatever" since the separation began, and the tone of all his testimony during that examination, make it plain that at no time has he relented in the least from that hostility to marital relations which caused their severance. Nor has he ever had the slightest reason for thinking that, if he suggested to his wife a desire for reconciliation, she would not gladly meet him with an unchanged purpose.

On all the evidence we can reach no other conclusion than that the desertion, which took place in September, 1899, began and has continued because of the willful, persistent and obstinate determination of Dr. Power to abandon his wife.

Power *v.* Power.

The causes for such determination are confessedly inadequate. They need not be further stated than by quoting the defendant's own words on the witness-stand: "It was distressing to her and distressing to me, and particularly distressing to the children for us to live together."

The decree dismissing the wife's petition should be reversed and in its stead a decree should be entered divorcing the parties from the bond of matrimony because of desertion by the husband.

The petition of Mrs. Power also prays that the custody of the children may be awarded to her. In response the husband, by way of cross-petition, asks that the custody of the older child, a boy, born in May, 1894, may be awarded to him, and the chancellor has so decreed.

After much hesitation we deem this decree also unwarranted.

Three considerations were chiefly influential upon the mind of the learned vice-chancellor by whom the decree was advised: the wealth and character of the husband's parents, who were willing to take the boy into their home and educate him; the desirability of withdrawing the boy from city life into a country home, and of subjecting him to such useful restraints as a father is more likely than a mother to impose.

But, as to the first point, it must be remembered that the decree gives the custody of the child to his father, not to his grandparents, and that they will be under no obligation to him other than such as their affection may create. While this affection may be strengthened by association with the child, we should not assume that without association it will be barren of utility to him while they live to manifest it. It is reasonable to hope that, with their abundant means, they will desire in any case to afford him the benefits of education.

As to the difference between city and country life the advantage of either over the other for a boy approaching maturity depends much upon the surroundings. The neighborhood in which Mrs. Power and the children live appears by the testimony to be an excellent one, the residence of refined people, many of whom are her friends, and with whose children this boy associates in play and at school. Two or three months every

summer she and they spend on the seashore of Rhode Island, and their health has been good, better than when they lived in Montclair.

On neither of these points does there appear any great preponderance in favor of awarding custody to the father.

But, on the remaining ground for judgment, the advantage of abiding with one parent rather than the other, we think the preponderance is decidedly with the mother.

The boy is only ten years of age, too young, even if he were an unruly child, to be beyond maternal control; he has been brought up under his mother's care, and undoubtedly feels for her the affection which such a relationship usually establishes, while his feeling for his father must be modified by estrangement. No suggestion is made that Mrs. Power is not in every respect fit to fulfill her duty to her children. Since their birth she has displayed toward them an ardent and self-sacrificing love, for which we find no equivalent in her husband's disposition, who appears to be, on the contrary, of a hard, intolerant and unsympathetic temper. The effect upon the moral and spiritual nature of the child, produced by constant association with such a mother far outweighs in value the possible material advantages to be secured by separation from her.

On the score of pecuniary ability to maintain a home, the evidence furnished by Mrs. Power's conduct since the separation is satisfactory if that ability be supplemented by such assistance as it will be Dr. Power's duty to render.

In view of all conditions we think the custody of the children should be awarded to Mrs. Power, and that the contrary decree should be reversed.

Let the cause be remitted to the court of chancery that proper order may be made for alimony, for the maintenance of the children and for other matters incidental to the decrees now directed.

*For reversal*—DIXON, GARRISON, FORT, BOGERT, VREDENBURGH, GREEN—6.

*For affirmance*—HENDRICKSON, PITNEY, SWAYZE, VROOM—4.